## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

GLENN MEARLS,

     Plaintiff,

v.

JAMES RUNNELS, Chief;
VINCE MITCHELL, Lieutenant;
DAN CALKINS, Captain, and all
individually, and as City of
Farmington Police Officers;
ROBERT MAYES, Individually
and as City Manager of Farmington.

.

No.  10-CV-740-BRB/LFG

## ORDER GRANTING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

**BALDOCK**, Circuit Judge.[*]

The City of Farmington terminated Plaintiff Glenn Mearls's employment as a police officer in 2008 after he drove his pickup truck to the police department while under the influence of the sleep aid Ambien CR, a controlled substance, and struck another automobile in the parking lot.  Plaintiff brought this § 1983 action alleging in Count I of his complaint that Defendant City Officials, in connection with

---

[*]  Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation pursuant to 28 U.S.C. § 291(b).

his termination and tangential events surrounding it, deprived him of unspecified "rights, privileges and immunities protected by the Constitution and federal law." Presently before the Court as to Count I is Defendants' "Motion for Summary Judgment on the Basis of Qualified Immunity." Because Defendants assert qualified immunity in the context of a summary judgment motion under Fed. R. Civ. P. 56, Plaintiff has the burden of showing Defendants violated his constitutional rights *and* those rights were clearly established. See Thomson v. Salt Lake County, 584 F.3d 1304, 1312 (10th Cir. 2009). In deciding whether Plaintiff has satisfied his two-prong burden of showing a violation of his clearly established rights, the Court construes the facts in a light most favorable to Plaintiff as the nonmoving party, *provided* those facts have record support. See id. Applying the proper standard, the Court concludes on the record before it that Plaintiff has not established a violation of his constitutional rights and therefore grants Defendants' motion.

## I.

The relevant facts, except as noted, are undisputed. The City of Farmington Drug & Alcohol Policy prohibits "[c]ontrolled substance abuse whether on or off City of Farmington property and whether during working hours or nonworking hours." Defs.' Exh. A, at 5. The Policy also " prohibits . . .[t]he use or consumption of any prescription . . . drug that *might* adversely affect one's ability to safely perform tasks." Defs.' Exh. A, at 6 (emphasis added). The Policy, however, permits an employee to use a controlled substance when such use "is under the direction

and instruction of a licensed medical practitioner and the employee has been instructed that the substance will not adversely affect the employee's ability to safely perform job tasks." Defs.' Exh. A, at 5. The Policy "requires each employee to advise management of any prescription . . . drug use that might adversely affect the employee's ability to safely perform tasks." Defs.' Exhibit A, at 5. An employee violating any portion of the aforesaid Policy "is subject to disciplinary action up to and including, termination." Defs.' Exh. A, at 7.

Prior to the November 2008 incident that gave rise to Plaintiff's suit, a Farmington Police Department Internal Affairs Report confirms that Plaintiff, around 4:20 p.m. on October 20, 2005, struck a traffic sign with his patrol car upon entering the parking lot of the police department. Plaintiff was in uniform but off duty. Investigators examining Plaintiff's vehicle "observed damage to the right front bumper area, push bumper, hood, driver's side mirror, and left rear quarter panel." Defs.' Exh. C, at 3. Suffice to say the eleven page Report also confirms that Plaintiff was substantially impaired at the time of the accident. Plaintiff admitted during a November 1, 2005 interview that when he drove his patrol car to the police station on October 20, "he was under the influence" of the sleep aid Ambien, a controlled substance. Defs.' Exh. C, at 9.

Plaintiff stated he had been using Ambien as a sleep medication in excess of four years. Although his care provider, Lloyd Percell, P.A., had prescribed Plaintiff 10mg tablets, Plaintiff admitted he usually took 15mg at a time and was then able to

sleep around four hours.  Plaintiff further acknowledged he had taken as much as 30mg of Ambien between 11:30 a.m. and 4:00 p.m. the day of the accident.  When asked if he ever experienced memory loss or unusual behavior after taking Ambien, Plaintiff referred to "a few occasions" when he had arisen from bed after taking Ambien and "done things like cook a meal or look for items in his home," only to "discover[] his actions afterward."  Defs.' Exh. C, at 8.  In a letter to the then police chief dated October 21, 2005, however, Plaintiff described his accident as an "isolated" incident, but acknowledged his conduct "should not go unpunished." Defs.' Exh. D, at 1.  Plaintiff stated he had "come to the conclusion I am no longer going to take that medication."  Defs.' Exh. D, at 1.  As a result of the investigation, Plaintiff was suspended without pay for thirty days and placed on probation subject to conditions, including counseling, for one year.

Shortly after the incident, Dr. Ken Stradling, Medical Reliance Group, advised Plaintiff "he was susceptible to 'sleep driving' with the use of Ambien and . . . should no longer use that product."[1]  Defs.' Exh. F, at 1.  Despite Dr. Stradling's warning, Plaintiff subsequently began using Ambien CR on the advice of Percell.

---

[1]  The 2005 Internal Affairs Report indicated that Plaintiff's Psychological Fitness for Duty Evaluation dated April 25, 2005 had forewarned that "Mearls may be abusing the prescription sleeping medication, Ambien."  Defs.' Exh. G, at 26. The Report also indicated that Dr. Stradling, in a letter dated October 20, 2005, the same day as the first incident, "recommended Mearls not take any Ambien if he was to function in a safety sensitive situation, i.e. as a police officer, unless he is getting a full eight hours of sleep after taking it."  Stradling addressed the letter to Personnel Director Donna Brooks and copied the letter to Plaintiff.  Defs.' Exh. G, at 27.

Plaintiff and Percell discussed a new formulation of Ambien known as Ambien CR which had demonstrated "much fewer side effects such as sleep driving and sleep walking."  Pl.'s Exh. 1, at 2.  According to Plaintiff:  "I believed that Ambien CR was safe for me to take and that I was not violating my statement to discontinue use of Ambien because the new formulation solved the problems associated with the older drug."  Pl.'s Exh. 1, at 2–3.  Plaintiff states "he took Ambien CR as a sleep aid without any problems in 2006, 2007, and in 2008," but only "mentioned" such use to his supervisor "a few months previous" to November 2008 while "talking about [the] old formulation of Ambien."  Pl.'s Exh. 1, at 3, 5.

In fall 2008, Plaintiff began experiencing personal relationship problems.  According to an Inter Office Memo from Lt. Cliff Washburn to Defendant, Lt. Vince Mitchell, Plaintiff on November 4, 2008, told Washburn about "some allegations his former girlfriend was making in reference to him taking prescription medications."  Defs.' Exh. G, at 32.  At that time, Plaintiff "assured" Washburn "he was not taking any prescription medication or sleep aids."  Defs.' Exh. G, at 32.  According to a second Inter Office Memo from Lt. Darin Hardy to Defendant Mitchell, Hardy asked Plaintiff on November 10, 2008 about his personal relationship problems.  Hardy commented:  "Because of a past incident that I was aware of, I inquired if [Plaintiff] had been taking sleeping medication . . . , [and] he responded that he was not taking any sleeping medication and hadn't for some time.  He said that he didn't need it at all."  Defs.' Exh. G, at 33.  Lt. Hardy suggested to Plaintiff, but to no avail,

5

that the Employee Assistant Program might help him with his problems.  Although Plaintiff acknowledges speaking with Washburn and Hardy on separate occasions in November 2008, he says "the issue of sleep medication never came up:"  "I spoke to Lt. Washburn about a personal problem and spoke to Lt. Hardy about getting a few days leave to visit my parents."  Pl.'s Exh. 1, at 5.

Two days after his conversation with Lt. Hardy, Plaintiff, on the morning of November 12, 2008, drove his pickup truck into the police department parking lot at a high rate of speed while off duty, hitting another pickup truck, which in turn collided with a passenger vehicle.  The accident occurred around 8:20 a.m.  According to a second Internal Affairs Report, forty-two pages in length, Plaintiff again was substantially impaired.  Witnesses described Plaintiff as swaying when he stood, slurring his speech, and wearing a v-neck football jersey backwards.  In an interview later that afternoon, Plaintiff claimed no recollection of the accident.  Immediately following the accident, the State Police were summoned and, after questioning Plaintiff and administering field sobriety tests, arrested him on suspicion of driving while impaired (DWI).  Around 10:30 a.m., or two hours following the accident, Plaintiff submitted to a drug screen which tested positive for Ambien.  The test indicated an Ambien level of "249" which, according to Dr. Stradling, was "compatible with acceptable prescription use."  Defs.' Exh. G, at 26.  Safety Officer Ryan Briggs reported the Ambien level in Plaintiff's urine was 249 nanograms per cubic centimeter (ng/cm), and the acceptable range for Ambien levels was between

6

58 and 272 ng/cm.  In a letter to Briggs dated December 3, 2008, Dr. Stradling

agreed the "newer formulation has a much smaller incidence of 'sleep driving,'" but

concluded nonetheless:  "Under current circumstances, I must inform you of the

obvious danger that Mearls poses as a police officer when under the influence of

Ambien and when performing safety sensitive activities."  Defs.' Exh. F, at 1.  After

reviewing the evidence, Defendant Mitchell found Plaintiff was impaired at the time

of the accident:

> The information contained in [the State Police] report combined with
> the accident, and the observations of other witnesses showed [Plaintiff
> at the time of the accident] was likely under the influence of Ambien to
> a degree that it rendered him incapable of safely operating a motor
> vehicle.  The information showed [Plaintiff's] blood level of Ambien
> at 249 ng/cm is on the high end of the spectrum.  With the reported
> peak level of Ambien being 1.5 hours, it showed [Plaintiff] should have
> been sleeping and not driving, thus [Plaintiff] was more likely than not,
> driving while impaired.

Defs.' Exh. G, at 27.

Following the accident, investigators uncovered an empty prescription bottle

of Ambien CR in Plaintiff's pickup.  The prescription was for 30 Ambien CR and

had been dispensed on October 31, 2008.  Plaintiff stated he had emptied the bottle's

contents into another container.  After Plaintiff posted bond and was released,

investigators accompanied him to his home where he was unable to locate the

missing tablets from his October 31 prescription.  Rather, Plaintiff produced another

prescription bottle containing three Ambien CR tablets.  That prescription, for

twenty-three Ambien CR, was filled on November 10, 2008.  Simple math indicates

that between October 31 and November 10, inclusive, Plaintiff came into possession of fifty-three Ambien CR tablets.  Two days later on November 12, 2008, Plaintiff could produce only three tablets.  Defendant Mitchell contacted Percell and provided him with the prescription information obtained during the investigation.  Percell informed Mitchell that he was aware of Plaintiff's most recent mishap based on newspaper accounts but could not release Plaintiff's medical documents without a subpoena.  Percell "did say the information contained within the records would be relevant."  Defs.' Exh. G, at 25.  Percell stated "he planned on dismissing Mearls as a patient because of the ongoing issue of non-compliance."  Defs.' Exh. G, at 25. In the Report, Defendant Mitchell found that Plaintiff, in addition to driving while impaired at the time of the accident, was abusing prescription medication:

> If this [November 10] prescription was taken as directed, there should have been at least 21 tablets in the bottle.  With 3 tablets still being in the bottle, it suggested Mearls didn't transfer the other 18 tablets to another container, as he said he routinely does.  Mearls was never able to locate any other Ambien tablets he said he possessed, and this information suggested Mearls abused the Ambien prescribed.

Defs.' Exh. G, at 23.

On December 8, 2008, the Chief of Police, Defendant James Runnels, notified Plaintiff in writing of his proposed termination:

> The major issue . . . is your abuse of the prescription drug Ambien. This was also an issue in the 2005 investigation in which you were involved in another incident while under the influence of Ambien.  At that time you were advised to discontinue the use of this drug and you obviously have not.  While I know that there is a slight pharmaceutical difference in this particular form of Ambien you are taking, it is still

> Ambien.  Your failure to disclose this use and the denial of use to supervisors is of great concern to the Farmington Police Department. Based on the . . . [foregoing], I am recommending your termination to the City Manager.

Defs.' Exh. H, at 1.  Following a pretermination hearing, Defendant Runnels in an Inter Office Memo dated December 15, 2008 to City Manager, Defendant Robert Mayes, recommended Plaintiff be terminated for, among other reasons, violating police department policy relating to the use of controlled substances, "[b]ased on his previous issues with Ambien abuse and subsequent discipline and the issues in the newest incident."  Defs.' Exh. K, at 1.  In the memo, Defendant Runnels expressly rejected Plaintiff's claim that he did not speak to Lt. Washburn or Lt. Hardy about his use of Ambien shortly prior to the November 12 incident, because such claim suggested both men had been mistaken.  On December 18, 2008, Defendant Mayes notified Plaintiff of his termination effective the following day.  Plaintiff exercised his right to appeal pursuant to personnel regulations.   An independent hearing officer, after considering the testimony of ten plus witnesses, subsequently sustained Plaintiff's termination:

> In summary, I believe Mr. Mearls was given several opportunities to get help and correct a serious problem.  Overall the City and specifically the Police Department did try to assist Mr. Mearls prior to this incident in dealing with his stressors and his approach to dealing with them.
>
> When all this failed, I believe they did a fair and impartial investigation of the incident.  Mr. Mearls must, therefore, accept responsibility for his actions and the City must protect themselves and the public.

Defs.' Exh. P, at 4.

II.

Given the foregoing facts and the haphazard manner in which Plaintiff presents his grievance, the Court is hard pressed to determine the precise nature of Plaintiff's constitutional claims against Defendants.  Plaintiff's complaint as to his actual termination appears aimed largely at Defendant Runnels, the Chief of Police who recommended his termination, and Defendant Mayes, the City Manager who actually terminated him.  Plaintiff admits he "was given adequate procedural due process," but still complains that Defendants, in terminating his employment, somehow deprived him of liberty and property in violation of the Fourteenth Amendment.[2] Response to Motion for Summary Judgment (hereinafter "Response") at 19.  Plaintiff asserts a property interest in his employment as a police officer and a liberty interest "in the right to have adequate medical treatment for his sleep disorder without losing his job."  Response at 13.  But even *assuming* Plaintiff presents a property or liberty interest worthy of constitutional protection, the substantive component of due process requires only that termination of such interest "not be arbitrary, capricious, or without a rational basis."  Curtis v. Oklahoma City Pub. Sch. Bd., 147 F.3d 1200,

---

[2]  This case most assuredly is not about equal protection.  The Fourteenth Amendment guarantee of equal protection "is essentially a direction that all persons similarly situated should be treated alike."  Straley v. Utah Bd. of Pardons, 582 F.3d 1208, 1215 (10th Cir. 2009) (internal quotations omitted).  Plaintiff, at times, argues he was treated differently than other city employees suffering side effects from prescribed medications, but presents absolutely no evidence whatsoever to establish his claim.  Plaintiff does not identify who those employees were, describe what problems they experienced, or explain how they were treated differently.

1215 (10th Cir. 1998) (internal quotations omitted). The Due Process Clause does not protect a public employee against a well-justified adverse personnel decision or even against an "incorrect or ill-advised" decision. Id. (internal quotations omitted).[3]

Here, the City of Farmington terminated Plaintiff's employment for, among other reasons, violating its written policy proscribing the abuse of controlled substances or the use of any prescription drug that "*might* adversely affect" his ability to safely perform the tasks associated with his employment. Defs.' Exh. A, at 5–6 (emphasis added). Ample evidence exists in the record to justify Plaintiff's termination on both accounts. Suffice to say the evidence gives rise to a justifiable inference that Plaintiff consumed upwards of fifty Ambien CR tablets in the two weeks preceding his second accident. Plaintiff's silence as to the ultimate whereabouts of that medication is resounding. Percell, his care provider, expressed concern over the "ongoing issue of non-compliance." Defs.' Exh. G, at 25. To make matters still worse, the record supports Defendant Mitchell's finding, upheld on administrative review, that Plaintiff separately informed Lt. Washburn and Lt. Hardy shortly before the November 12 incident that he was not using sleep medication.

---

[3] Plaintiff's repeated offhand references to disability discrimination and the ADA fall on deaf ears. Aside from the fact Plaintiff has acknowledged he has no ADA claim, see infra n.4, nothing in the record suggests he has satisfied the prerequisite to pursuing such claim. The ADA requires a plaintiff to exhaust his administrative remedies before filing suit. In the Tenth Circuit, exhaustion of such remedies, namely pursuing discrimination charges with the EEOC, is a jurisdictional prerequisite to filing suit. Jones v. U.P.S., Inc., 502 F.3d 1176, 1183 (10th Cir. 2007). Plaintiff does not allege exhaustion.

To be sure, Percell informed Plaintiff that side effects from his use of Ambien CR, necessarily *as prescribed,* were much less likely to occur, but issued no guarantee. Contrary to Plaintiff's wishful thinking, Ambien CR was not "safe" for him to take and had not "solved" the problem associated with Ambien.  Pl.'s Exh. 1, at 2-3 Given his past history and failure to disclose his use of Ambien CR to his superiors in a forthcoming, timely fashion, Plaintiff acted at his peril.

Of course, facts are stubborn things.  The point is Plaintiff has presented *no* evidence to contradict any part of the foregoing factual recitation or the reasonable inferences to be drawn therefrom.  With rights come responsibilities–in this case, responsibilities to an employer and a public that the record reveals Plaintiff chose to ignore despite fair warning of the problem and opportunity to address it.  The Constitution does not require the City of Farmington to wait until Plaintiff seriously injures someone while in a Ambien-induced blackout to relieve him of his duties as a police officer.  This Court is not an omnipotent overseer of the internal operations of the Farmington Police Department.  So long as those operations meet minimal constitutional and statutory safeguards, which they undoubtedly did in this case, the Court is oath bound to stay its hand.  No reasonable jury, based on the record before the Court, could find Plaintiff's termination was arbitrary, capricious, or without a rational basis.  Accordingly, no reasonable jury could find that Defendants Runnels and Mayes deprived Plaintiff of his constitutional right to liberty or property in terminating his employment.

12

III.

Plaintiff also seeks to support his Fourteenth Amendment claim based on the allegedly wrongful actions of Defendants Lt. Mitchell and Cpt. Calkins.  Plaintiff says Defendant Calkins, whose role in the process leading to Plaintiff's termination is unclear, violated his right to privacy by "disclosing matter[s]" about the 2005 internal affairs investigation to the prosecutor in Plaintiff's April 2009 DWI trial– a trial which resulted in Plaintiff's acquittal.  Response at 22.  In an affidavit, to which Plaintiff does not respond, Defendant Calkins sets the record straight.  Plaintiff subpoenaed Calkins to appear at his DWI trial.  During jury selection, Calkins heard Plaintiff's attorney state that Plaintiff did not know Ambien might affect his ability to drive:

> After I heard Mr. Mearls'[s] attorney make that representation, and after the jury was excused, I told the prosecutor that Mr. Mearls had been involved in a previous incident, in 2005, in which he had been in an accident while driving his police vehicle under the influence of Ambien.  I did that because if Mr. Mearls had testified as his lawyer had represented he would have committed perjury.

Defs.' Exh. Q, at 2.  After the prosecutor told the judge that Defendant Calkins had information about a prior internal affairs investigation involving Plaintiff, Calkins advised the judge he could not comment on that investigation because Plaintiff had not yet testified.  When Plaintiff's attorney pressed the matter, the judge directed Calkins to take the witness stand outside the presence of the jury.  Plaintiff's attorney questioned Calkins about the 2005 incident and whether he had disclosed

13

the incident and its outcome to the prosecutor.  Calkins answered truthfully.

Plaintiff cites absolutely no authority to sustain the proposition that Defendant Calkins' general disclosure to the prosecutor during Plaintiff's criminal trial violated his right to privacy under the United States Constitution.  The Federal Constitution's right to privacy does not extend nearly so far as the right to privacy protected by state tort law:  "Indeed, the constitutional right of privacy, which courts have been reluctant to expand, shields from public scrutiny only that information which involves deeply rooted notions of fundamental personal interests derived from the Constitution."  Nunez v. Pachman, 578 F.3d 228, 232 (3d Cir. 2009) (internal quotations omitted).  Not every disclosure of personal information by a public official implicates the constitutional right to privacy.  The entire basis of Plaintiff's claim appears to be that the police department considers such investigations confidential.  But in Mangels v. Pena, 789 F.2d 836, 839–40 (10th Cir. 1986), the Tenth Circuit held the release of an internal affairs report finding plaintiffs, former public employees, had used illegal drugs did not implicate their constitutional right to privacy, despite the fact that officials had assured plaintiffs of the report's confidentiality:  "Allegations on the part of government officials to abide by their own assurances of confidentiality will not suffice to state a claim."  Defendant Calkins's disclosure of Plaintiff's prior wrongdoing to the prosecutor in general terms–wrongdoing to which Plaintiff also openly admitted in a letter to the police chief–fails to touch upon those fundamental personal interests the Constitution

14

protects under the rubric of privacy, regardless of the department's assertion of confidentiality.  Compare Nilson v. Layton City, 45 F.3d 369, 371 (10th Cir. 1995) (holding plaintiff had no constitutionally protected privacy interest in an expunged criminal record), with Anderson v. Blake, 469 F.3d 910, 914-15 (10th Cir. 2006) (holding plaintiff had a constitutionally protected privacy interest in the contents of a video tape depicting her alleged rape).

Plaintiff also asserts that Defendant Mitchell's "elicitation or coercion of privileged information from the Plaintiff's doctor . . . is actionable under § 1983 pursuant to the Plaintiff's rights under the Fourteenth Amendment."  Response at 15. Nothing, however, prohibited Defendant Mitchell, in the course of an investigation related to Plaintiff's employment, from contacting Percell to inquire about Plaintiff's medical status.  Percell properly stated he could not disclose Plaintiff's medical records without a subpoena.  Percell also commented that he planned to dismiss Plaintiff as a patient "because of ongoing issues of noncompliance."  Defs.' Exh. G, at 25.  "There is no question that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of material entitled to [constitutional] privacy protection."  Lankford v. City of Hobart, 27 F.3d 477, 479 (10th Cir. 1994).  But nothing in the record suggests Defendant Mitchell, through some unexplained covert use of force, obtained Plaintiff's medical records or even "intimate facts of a personal nature" about Plaintiff from Percell.

Plaintiff's attempt to base his substantive due process claim on Defendant Mitchell's questioning of him on the day of the accident is similarly meritless. Defendant characterizes that questioning as an "interrogation" while he "was in an obviously confused state." Response at 21. Nothing could be further from the truth. In his affidavit, Plaintiff says that on the morning of the incident "at approximately 4:30 a.m., I took an Ambien CR and went to sleep." Pl.'s Exh. 1, at 3. According to the Report, Defendant Mitchell began questioning Plaintiff nearly twelve hours later, at around 3:45 p.m. that same day. During the interview, Plaintiff told Defendant Mitchell that although he did not remember the accident or events immediately following it, "everything was pretty much clear as the day" after he was booked by the state police. Defs.' Exh. G, 8.

On the basis of the present record, no reasonable jury could find Defendants violated Plaintiff's constitutional rights. Accordingly, Defendants are entitled to qualified immunity on Plaintiff's § 1983 claim under the first prong of the applicable two-part inquiry. Defendants' motion for summary judgment as to Count I based on qualified immunity (Doc. # 4) is therefore GRANTED. On the basis of Defendants' uncontested representation that Plaintiff has agreed to dismiss the remaining counts of his complaint, those counts are hereby DISMISSED.[4]

---

[4] At the outset of their motion, Defendants point out that in addition to the § 1983 claim alleged in Count I of his complaint, Plaintiff alleges in Counts II and III that Defendants (1) treated him in a "discriminatory and unfair manner based on (continued...)

SO ORDERED.

Entered for the Court
this 10th day of November 2010


Bobby R. Baldock
United States Circuit Judge
Sitting by Designation

---

[4](...continued)
his disability," namely a "sleep disorder and the side effects of the medication used
to treat it," in violation of the Americans With Disabilities Act (ADA), and
(2) wrongfully discharged him contrary to state and local laws "enacted to provide
fair procedures for hearings, investigations and disciplinary action against city
employees."  According to Defendants, Plaintiff has since acknowledged he has no
cause of action under either of the latter two theories of recovery and "has agreed to
dismiss these claims."  Motion for Summary Judgment at 1 n.1; see also id. at 22
(stating "Plaintiff concedes he has no cognizable claims against Defendants under
the [ADA] or for wrongful discharge").  While Plaintiff in his response memorandum
refers to disability discrimination and cites the ADA as well as numerous other laws,
nowhere does he contest Defendants' representation or outline with particularity any
claim arising under the ADA or state law.  Specifically, Plaintiff utterly fails to set
forth in his complaint or response memorandum the elements of such claims and
explain why those elements are met in this case.  Accordingly, the Court dismisses
Counts II and III of Plaintiff's complaint